# Exhibit A

Exhibit A

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

--------------------------------------------------------

JAKE BAIJOT-CLARY,                )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) No. C12-1096 JCC
                                  )
GARTH HAYNES (individually        )
and in his official               )
capacity); CHRISTOPHER            )
CHRISTMAN (individually and       )
in his official capacity);        )
and THE CITY OF SEATTLE, a        )
municipal corporation,            )
                                  )
          Defendants.             )

--------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

GARTH HAYNES

--------------------------------------------------------

Taken at 2100 Westlake Avenue North

Suite 206

Seattle, Washington

July 10, 2013

9:30 a.m.

Reported by:  Sharon Rindal, CCR No. 2680

Garth Haynes                                          July 10, 2013

Page 85



10  Q   Is kicking a suspect in the head ever an appropriate
11      use of force?
12  A   No.  But, again, you know, it depends on what the
13      situation is.  Who knows what the situation you might
14      end up in.  But kicking, no, is not.
15  Q   So you -- is it your testimony that there are certain
16      situations in which it is an appropriate use of force
17      to kick a suspect in the head?
18  A   Well, if you get into a fight with somebody who is
19      beating you up, I mean, you have to, to get him under
20      control so you can save your life, right?
21  Q   Including kicking him in the head?
22  A   I'm not saying you should.  But you have to do what
23      you have to do to save your life, right?  And
24      sometimes we do meet suspects that are bigger,
25      stronger and more trained than us and, you know, if

Garth Haynes                                               July 10, 2013

1        you were a police officer, you would -- in so much

2        trouble where somebody is really beating you up, you

3        would do what you have to do to survive, right?  Or

4        would you stop to think about kicking someone in the

5        head?  I mean . . .

6    Q   Okay.  So in the situation in which you are working as

7        a police officer and a suspect is beating you up and

8        you have to defend yourself, then it would be

9        appropriate to kick the suspect in the head?

10   A   Well, if it -- if it's necessary to save your life.

11   Q   Okay.  But it -- so I want to make sure I understand

12       what your testimony is.

13           So it would only be appropriate to kick a suspect

14       in the head if it's for the purpose of saving your own

15       life?

16   A   Well, it depends.  Force -- use of force depends on

17       the situation.  So you have to -- as an individual,

18       you have to determine, you know, what kind of force

19       you will use and, you know, when to apply it and when

20       it's -- like I said, when it's necessary.  So kicking

21       somebody in the head, no, it's not appropriate.  But

22       there's some situations where you do need, you know,

23       to think about, you know, certain things like, you

24       know, if it's necessary to save your life.

25   Q   Okay.  So I want to be clear.

Garth Haynes                                          July 10, 2013

1          It's not -- your testimony is that it is not

2      appropriate to kick a suspect in the head?

3    A   No, it's not.

4    Q   No, it's not your testimony or no, it's not --

5    A   No, I said no, it's not appropriate to kick somebody

6      in the head.

7                    MS. GONZALEZ:  We need to change the



Garth Haynes                                    July 10, 2013

Page 93



18    Q    (By Ms. Gonzalez)  What type of situations would it be

19         permissible for you to use your foot to forcefully

20         push a suspect's head onto the ground?

21    A    If somebody's attacking you and you can't get them

22         with your hands, you use your foot.

23    Q    Any other type of situation in which it would be an

24         appropriate use of force to use your foot to

25         forcefully push a suspect's head onto the ground?

Garth Haynes                                        July 10, 2013

Page 94

1                    MR. CHRISTIE:  Object to the form,

2       vague, calls for an opinion.

3                    You can answer if you can.

4    A   I can't think of any other.



Garth Haynes                                          July 10, 2013

Page 96



 8  Q   (By Ms. Gonzalez)  Is it your position in this case
 9      that Jake Baijot-Clary was noncompliant while he was
10      prone and handcuffed on December 12, 2010?
11                     MR. CHRISTIE:  Object to the form.
12  A   I -- I don't understand.  Repeat the question.
13  Q   (By Ms. Gonzalez)  Is it your position in this case
14      that Jake Baijot-Clary was noncompliant while he was
15      prone and handcuffed on December 12, 2010?
16  A   I can't recall that -- that part of December 12th.
17  Q   So you don't recall whether Jake Baijot-Clary was
18      handcuffed?
19  A   I knew he was handcuffed later, but, you know, I don't
20      know -- I can't remember him being handcuffed and
21      compliant on the ground.  I can't remember that in the
22      prone position.
23  Q   So it's your testimony that at the time that you were
24      on the scene on December 12th of 2010, you do not
25      remember that Jake Baijot-Clary was handcuffed?

Garth Haynes                                                    July 10, 2013

                                                                   Page 97

 1   A   I know he was handcuffed, but I don't remember, like,
 2       how it occurred.
 3                       THE REPORTER:  Like, how it
 4       occurred?
 5   A   Yes.  I mean, I knew we did it.  I knew, you know --
 6       but I -- I just don't recall that part.  After I was
 7       kicked in the head, I don't remember.
 8   Q   (By Ms. Gonzalez)  And so, again, I want to -- I want
 9       to be clear.
10           When you were on the scene on December 12th of
11       2010, you do not know one way or the other -- at that
12       point in time you do not know one way or the other
13       whether Jake Baijot-Clary was handcuffed?
14   A   I knew he was handcuffed.
15   Q   At the time or later?
16   A   I knew he was handcuffed later.
17   Q   Meaning that you learned that he had -- was handcuffed
18       while on the ground, but you learned of that fact
19       later?
20   A   Later on.
21   Q   Okay.  Is it your testimony -- is it going to be your
22       testimony at the time of trial that Jake Baijot-Clary
23       was noncompliant while he was prone on the ground?
24                       MR. CHRISTIE:  Object to the form.
25   A   I can't recall.

Garth Haynes                                              July 10, 2013

Page 98

1   Q   (By Ms. Gonzalez)   Okay.   So you don't recall any
2       details about what Jake Baijot-Clary was doing while
3       he was on the ground on December 12th of 2010.
4           Is that your testimony?
5   A   No.   I can't remember what he was doing after he was
6       handcuffed and prone on the ground.   I can't recall.
7   █
8
9
10
11  A
12  Q
13  A
14  Q
15  A
16
17  Q
18  A
19  Q
20
21  A
22  Q
23  A
24  Q
25  A

Garth Haynes                                              July 10, 2013

Page 113



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21   Q   (By Ms. Gonzalez)  So it was between the time he
22       arrived, which is at midnight, but certainly no later
23       than 12:30 that you left?
24   A   Yeah, we -- we left before 12:30.
25   Q   Okay.  So what did you and Joel discuss in terms of
```

Garth Haynes                                              July 10, 2013

1        your plans for the evening once he arrived at Shane's

2        house?

3    A   He just asked me is there anywhere that, you know,

4        like, a cool place where you can go and, you know,

5        have -- you know, have a drink or two where there's

6        music.  You know, he wanted -- likes places with, you

7        know, music in there, and so -- you know.  That was

8        it.

9    Q   And what did you say?

10   A   Well, I thought about the BalMar because I had been

11       there before.

12   Q   And had he been to the BalMar?

13   A   I can't recall.

14   Q   All right.

15           And so once you all -- okay.  Just so I'm clear,

16       you suggested the BalMar?

17   A   Yes.

18   Q   And he was fine with that?

19   A   Yes.

20   Q   Okay.  So then how did you -- what did you all discuss

21       in terms of how you would get there?

22   A   We drove there.

23   Q   In separate cars or together?

24   A   Separate cars.

25   Q   Did you tell him how to get to the BalMar?

Garth Haynes                                           July 10, 2013

Page 115



1    A    He just followed me.

Garth Haynes                                    July 10, 2013

Page 124



11  A     Well, he was with a group of people.  One of the

12        group -- the group, one of the girls is the one that

13        took my jacket, stole my jacket.

14                       THE REPORTER:  Stole my jacket?

15  A     Stole my jacket.

Garth Haynes                                          July 10, 2013



21  Q   When you reviewed the OPA file, did you read a

22      statement from a young woman named Sarah?

23  A   I believe so, yes.

24  Q   And that's the woman you claim stole your jacket,

25      correct?

Garth Haynes                                            July 10, 2013

Page 126

1    A    Yes, ma'am.



Garth Haynes                                    July 10, 2013

Page 132

1  ████████████████████████████████

2  ██████████████████████████████████████████

3  ██████████████████████████████████████████

4  ████████████

5  ███████████████████████████████████

6  Q  Okay.  And tell me what you recall about seeing them

7     leave.

8  A  They just all left in a bunch.  They just -- you know,

9     because I was, like -- my coats were behind -- our

10    coats were behind us, and we are standing there having

11    our beer, I was having my beer, and the D -- the DJ,

12    the guy playing the music was in front of us, and,

13    like, the dance floor was in front of us, because it's

14    a pretty small dance floor.  And the lights came on,

15    and then people just started leaving.  But the stairs,

16    like, I could see everybody who was leaving.

17 Q  Okay.  Did the -- the group that the Bill Pierre Auto

18    guy was with, did that group leave before the lights

19    came on or after the lights came on?

20 A  I'm not too sure.  I think they left when the lights

21    came on.  Because once the lights and the music

22    stopped -- when the light came on and the music

23    stopped, it appeared that everybody left.  They were

24    starting to leave.  So we thought that, yeah, they

25    were going to close since the lights came on.  We

Garth Haynes                                      July 10, 2013

Page 133

1    thought they were going to close the place.  So once

2    everybody started leaving, we just thought, oh, we

3    should probably leave, too.



Garth Haynes                                          July 10, 2013

Page 133



1

2

3

4    Q

5

6    A

7    Q

8

9    A

10

11

12    A

13

14

15

16

17    Q

18

19    A

20    Q

21    A

22    Q    Were there any other coats around the area where you

23          put yours?

24    A    I don't recall seeing any.

25    Q    Okay.   Okay.   So then you look around upstairs, and

Garth Haynes                                          July 10, 2013

Page 134

```
 1      you're unsuccessful in your attempt to locate the

 2      coats, and then what do you do?

 3   A  Well, I looked all around, and I looked around

 4      upstairs to see if anybody picked it up by accident,

 5      and then I went downstairs and looked -- looked around

 6      downstairs, and then I -- I remember, you know, that

 7      group was kind of standing next to us.  So, you know,

 8      I went down there, and I saw them, you know.

 9           As soon as I came out the door, you know, the

10      girl who stole my coat was standing there.  And she

11      was holding coats.  She had a coat on.  So I stood and

12      I looked to see -- before I approached her to make

13      sure if it was my coat she was holding, and I verified

14      it was mine, so I went and asked her for my coat.

15   Q  Okay.  How did you ask her?

16   A  I was, like, Miss, I think you're holding my coat.

17      And she said -- she said no.  Because I'm always

18      respectful and professional when I approach anybody.

19      ████████████████████████████████████████████████████

20      ██████████████████████████████████████████

21      ██████████████████████████████████████████████████

22      ██████████████████████████████████████████████████

23      ██████████████████████████████

24                ██████████████████████████████████

25      ██████████████████████████████████████
```

1 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   Q   Okay.  So your first thought was, well, there was this

17       group standing next to us; maybe they accidentally

18       took our coats?

19   A   Yes.

20   Q   And then you go downstairs, and you see a young woman

21       holding coats, and in your mind you verify that those

22       are yours.

23           How did you go from assuming that maybe it was an

24       accidental take, versus somebody stealing them?

25   A   Well, because when I asked her, I asked her nicely, I

Garth Haynes                                              July 10, 2013

Page 136

1       was, like, Miss, I think you have my coat.  And she's,

2       like, No, this is not your coat, this is my friend's

3       coat.  And I was, like -- I was, like, Well, you know,

4       you're wearing a coat and everybody else in your group

5       is wearing a coat, and I think that's my coat.  And

6       she goes, No, I told you, it's not your f'ing coat.

7            So, I mean, she was getting defensive.  Instead

8       of trying to reason with me, she got irate.  I mean,

9       with my experience as a police officer, when somebody

10      is acting so defensive and, you know, irrational,

11      something's up.  Something wasn't right.

12      ███████████████████████████████████████████████████

13      ██████████████████████████████████████████████

14      ████████

15      ███████████

16      ████████████████████████████████████████████████████

17      ████████████████████████████████████████████████████

18      █████████

19      ████████████████████████████████

20      █████████████████████

21      ██████████████████████████████████████

22      ████████████████████

23      ███████████████████████████████████████████

24      ██████████████████████████████████████████████████████

25      ██████████████████████████████████████████████████████

Garth Haynes                                          July 10, 2013

Page 141



19  Q    Okay.  So then what did you say in response to that?

20  A    Well, when she said that, because she was basically

21       yelling at this point, you know, whatever group was

22       around there started huddling, including whoever was

23       at the hot dog stand, they focused their attention on

24       us.  You know, Joel was there at that point.  At that

25       time, I took my badge out and said, I'm a Seattle

Garth Haynes                                          July 10, 2013

Page 142

```
 1      police officer, you stole my coat.  And she said, I

 2      don't give a fuck if you're a Seattle police officer.

 3  ●

 4

 5  ●

 6  ●

 7

 8

 9  ●

10  ●

11  ●

12  ●

13  ●

14

15  ●

16

17

18

19  ●

20

21  ●

22  ●

23  ●

24

25  ●
```



Garth Haynes                                          July 10, 2013



Page 147

1

2   Q   Okay.  I think you said earlier that you never removed

3       your gun from the holster; is that correct?

4   A   No, I didn't remove the gun from the holster.

5   Q   Did you ever lift your shirt to show either Sarah or

6       anybody else in the crowd that you had a gun?

7   A   No.

8   Q   When you lifted your shirt to remove the badge, did

9       you lift it up high enough to show your gun?

10  A   Well, I didn't lift it for the intention to show my

11      gun, but since the badge is so close to the gun, it's

12      possible that they may have seen the gun with the

13      badge.

14

15

16

17

18

19

20

21

22

23

24

25

Garth Haynes                                          July 10, 2013

Page 151



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24    Q    Okay.  At that point, had you decided what statute she
25         was in violation of?

Garth Haynes                                    July 10, 2013

Page 152

1   A   She stole my coat.

2   Q   Okay.  And so at that point in time, had you

3       determined what -- you're saying that she stole your

4       coat.

5           What criminal statute was that -- was that a

6       violation of?

7   A   It's a theft.

8   Q   And what are the elements of a theft?

9   A   When you take something that belongs to somebody else.

10  Q   Is there an intent requirement?

11  A   I don't know if she had intent or not.

12  ●  ████████████████████████

13     ██████████████████████████████████████

14     ███████████████████████████████

15  ●  ███

16     ██████████████████████████████████████

17     ██████████████

18  ●  ████████████████████████████████████████

19     █████████████████████████████

20  ●  ████████████████████████████████

21  ●  ████████████████████████████████████

22  ●  ████████████████████████████████████████

23     █████████████████████████████████████████

24     ██████████████████

25  ●  ███████████████████████████████

Garth Haynes                                                July 10, 2013

Page 156



15   Q   (By Ms. Gonzalez)  Officer Haynes, you have seen the

16       dash cam footage related to this case in which you

17       appear; is that correct?

18   A   Yes.

19   Q   Okay.  And would you agree that the video shows that

20       you place your foot on Mr. Baijot-Clary's head?

21   A   Well, whatever the video shows, that's what -- what

22       happened.

23   Q   So when you saw the video, what did you see it

24       showing?

25   A   I mean, you saw the video.  I mean, do I have to

Garth Haynes                                      July 10, 2013

```
 1      actually say what I saw?  I mean --
 2   Q  Yes, you do.
 3                    THE WITNESS:  Do I have to?
 4                    MR. JACKSON:  You have to answer her
 5      questions.  I'll object that the video speaks for
 6      itself, but you have to answer her questions.
 7   A  Go ahead and repeat the question.
 8   Q  (By Ms. Gonzalez)  Sure.  What did -- what do you --
 9      when you viewed the video, what did you see on it in
10      terms of your conduct?
11   A  Well, it wasn't -- it was something I wouldn't do on a
12      normal day.  Let's put it that way.
13   Q  I wasn't asking --
14   A  It wasn't good conduct.
15   Q  Was it --
16   A  Was that good?
17   Q  I'm asking you to describe for me in your own words
18      what you saw yourself do when you watched the dash cam
19      footage.
20   A  You want me to describe what I saw exactly what I did?
21   Q  Yes.
22   A  Well, the video showed me, you know, pushing him with
23      my foot.
24   Q  Pushing him where?
25   A  Pushing him down with my foot.
```

Garth Haynes                                              July 10, 2013

Page 158

| | | |
|---|---|---|
| 1 | Q | What part of your body -- what part of your body |
| 2 | | contacted his body? |
| 3 | A | Well, my -- it -- the video showed that my foot was |
| 4 | | pushing his head down. |
| 5 | Q | Down into what? |
| 6 | A | To the ground. |
| 7 | Q | And when you watch the dash cam footage, did you see |
| 8 | | that Mr. Baijot-Clary was handcuffed? |
| 9 | A | Well, yeah, after the whole incident I watched it, |
| 10 | | yeah, I saw it. |
| 11 | Q | And was there any justified reason for your conduct in |
| 12 | | terms of putting your foot on his head? |
| 13 | A | Well, I said there's no justified reason, you know. |
| 14 | ● | ████████████████████████████████████████████ |
| 15 | | ███████████████████████████████████████████████ |
| 16 | | ██████████████████████████████████████████████ |
| 17 | ● | ████ |
| 18 | ● | ███████████████████████████████████████ |
| 19 | | ██████████ |
| 20 | ● | ████ |
| 21 | ● | ████████████████████████████████ |
| 22 | ● | █████████████████████████████████████████████ |
| 23 | | ██████████████████ |
| 24 | ● | ███████████████████████████████████ |
| 25 | | ███████████████████████████████████ |